## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20717-CR-GRAHAM/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

YANIEL MEDINA,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS

      This matter is before the Court on Defendant Yaniel Medina's Motion to Suppress [D.E. 33] and the Government's Response thereto [D.E. 36].[1]  Defendant seeks to suppress evidence seized during a search of his wallet and statements he made following that search.  An evidentiary hearing was held on this matter on October 19, 2009.  Defendant and two officers testified, and three exhibits were admitted into evidence.  At the conclusion of the hearing, the parties were directed to file supplemental briefing on specific issues.  [D.E. 39, 41].  Having carefully considered the motion, response, supplemental filings, testimony of the witnesses, exhibits admitted at the hearing, and oral arguments of counsel, and being fully advised in the

_____

[1]      This matter was referred to the undersigned Magistrate Judge by the Honorable Donald L. Graham for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and S.D. Fla. Mag.J.R. 4.  [D.E. 34].  We note that co-Defendant Michel Duarte ("Duarte") did not file his own motion to suppress nor did he join in Defendant's motion.

premises, the Court recommends that Defendant's motion to suppress be DENIED for the reasons forth below.

## I.   FACTUAL FINDINGS

Defendant Yaniel Medina ("Defendant") was indicted on charges of credit card counterfeiting and aggravated identity theft.  [D.E. 22].  The following facts, taken from testimony adduced at the hearing, describe the events that led to his indictment.

### A.   *Testimony from Detectives Hernandez and Barazal*

On the morning of July 29, 2009, sometime between 10:00 and 10:45 a.m., Sergeant Michael Tabanero and Detective Lourdes Hernandez, two narcotics officers with the Miami Dade Police Department ("MDPD"), arrived at 4225 S.W. 98th Court in Miami, Florida, to investigate an anonymous tip that the residence was being used as a marijuana "grow house."  Two individuals were inside the house, Defendant and co-Defendant Duarte.  Duarte answered the officers' knock at the front door.  After ascertaining that Duarte was the owner of the residence, the officers obtained his written consent to search the house.  *See* Def. Ex. B.  The consent form was signed at 11:12 a.m.  Duarte led them inside where they found Defendant in the living room.

Duarte guided the officers through the house.  They did not find narcotics but they did observe in a room adjacent to the living room, in plain view, multiple stacks of credit cards[2] and equipment that could be used to generate counterfeit credit cards. Det. Hernandez testified that they knew the cards were connected with illegal activity, however, credit card fraud was not their area of expertise so they contacted Detective

---

[2]      Over 1,200 credit cards were discovered.

Adrian Barazal with the MDPD Economic Crimes Bureau for assistance.  From that point on, both Duarte and Defendant were detained through the conclusion of the investigation, in accordance with standard MDPD procedure that calls for the detention of individuals in the face of illegal activity, until such time as the officers could determine who was or was not involved.

It took approximately thirty to sixty minutes for Det. Barazal to arrive.  During that time, Defendant and Duarte sat on a sofa in Duarte's living room, watching a baseball game on television.  They were not handcuffed or otherwise physically restrained.  They were calm and cooperative, and neither man asked or attempted to leave.  Det. Hernandez did not ask Defendant any questions.  She was not in uniform although she did carry a gun, which may or may not have been visible underneath her shirt.

Det. Barazal was briefed by the other officers upon his arrival.  He went to the room adjacent to the living room and observed credit cards everywhere, as well as computers, printers, and other items that convinced him this was a credit card-making lab.  He then contacted the U.S. Secret Service because he thought it was something they might be interested in as it "would probably meet their criteria."  Det. Barazal took photographs and maintained the scene while waiting for a Secret Service agent to arrive.  He did not attempt to speak with Defendant or Duarte.

It took Secret Service Special Agent Ryan Kennerson approximately thirty minutes to arrive.  Det. Barazal reviewed the evidence with Agent Kennerson, then they interviewed Duarte and Defendant.  The interviews were conducted separately, in a back room of the house.

After Duarte was advised of his *Miranda* rights, he spoke with the officers.  He took sole responsibility for the credit cards and advised that Defendant was not involved in any way.  The interview ended and Duarte returned to the living room.

The officers then asked Defendant to the back room.  He followed.  He was calm and cooperative.  Det. Barazal advised Defendant of his *Miranda* rights using a standard Secret Service *Miranda* rights waiver form.  Defendant is a Spanish-speaker.  Det. Barazal, who also speaks Spanish, read the form to Defendant in Spanish while Defendant read along.  The detective asked Defendant if he understood his rights, to which Defendant responded in the affirmative.  He then executed the waiver at 2:30 p.m.  *See* Govt. Ex. 3.

Defendant told the officers he had no involvement in the credit card activity.  He stated he was as Duarte's house waiting for a ride.   The officers concluded the interview and were prepared to release Defendant as they had no basis to further detain him.  As the three men were returning to the living room, Det. Barazal testified that he asked Defendant if he could "check" Defendant's wallet, after being prompted to do so by Agent Kennerson.  Defendant pulled out his wallet and handed it to the detective, who searched it.

Inside Defendant's wallet were two Bank of America debit cards with the same account number embossed on the front, which raised suspicions with the officers.  Det. Barazal then used a credit card reading machine to swipe the cards.  He discovered that the magnetic strip on the back of one of the cards had been re-encoded such that the number on the strip did not match the number embossed on the front.  Faced with

this evidence, Defendant made inculpatory statements about the card.  Subsequent cataloging of the credit cards found inside Duarte's house revealed six cards embossed with the name "Yaniel Medina Lazo."  Both men were arrested and later indicted on charges of conspiracy to commit credit card counterfeiting, among other charges.

### B.    *Testimony from Defendant*

Defendant disputed some of the salient points of the officers' testimony.  He testified that he repeatedly asked to leave after both he and Duarte denied his involvement with the credit cards.  He also testified that, during his interview with the officers, Detective Barazal translated the *Miranda* form for him but would not allow him to read it in Spanish.  He signed the waiver after being told he could leave once the interview was over.  Finally, he claims he did not consent to a search of his wallet. Defendant testified that once the interview was over, as the three men were returning to the living room and Defendant thought he would be released, Special Agent Kennerson told Det. Barazal, in English, to check Defendant's wallet.  The detective then told Defendant to give him his wallet, so Defendant pulled it out and the detective took it from him.

## II.    ANALYSIS

Defendant originally moved to suppress the evidence seized from Duarte's residence.  However, at the suppression hearing, defense counsel appropriately conceded that Defendant lacks standing to challenge the entry into, and subsequent search of, the premises.[3]  Defendant continues to seek suppression of the evidence

---

[3]    This concession is well-founded.  At the hearing, Defendant testified that he went to Duarte's house shortly before the officers arrived, in order to leave his car

seized from his wallet and the statements he made after the wallet was searched.  He

contends that the length of his detention, occurring as it did without a warrant or

probable cause, was excessive and unreasonable.  Accordingly, he did not voluntarily

consent to the search of his wallet, and the fruits of that search must be suppressed.

Even assuming his consent *was* voluntary, Defendant contends that the scanning of

---

for Duarte's wife who needed transportation to her job.  When the officers arrived, Defendant was waiting for his wife to pick him up.  Beyond this explanation as to why he was in Duarte's house on July 29th, Defendant presented no evidence showing that he has any interest in the premises or in the evidence seized following a search of the premises.

As a temporary guest in Duarte's residence, Defendant had no reasonable expectation of privacy in the house and, consequently, lacks standing to challenge the search thereof.  *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984) ("[M]ere presence in the apartment would not be enough to give [the defendant] standing, for the precedents binding on this court require that an occupant other than the owner or lessee of an apartment demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy."); *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984) (defendant who was visiting apartment when it was searched and who failed to allege any possessory interest or expectation of privacy in the apartment or the evidence seized therefrom lacked standing to challenge the search).

In fact, given Defendant's lack of standing to challenge the search of the premises, our initial inclination was to *not* hear evidence concerning the officers' entry into the house and their investigation of items discovered therein.  *Sneed*, 732 F.2d at 888 ("The concepts of due process do not require that a defendant who fails to make the fundamental allegations in his motion to suppress [i.e., that he has a legitimate expectation of privacy in the premises searched or property seized,] be afforded a pretrial hearing on his motion.").  However, as both sides recognize, Defendant does have standing to challenge the search of his wallet.  Part of his argument for suppression is that any consent he may have given to search the wallet was involuntary, given the excessive length of his detention.  Accordingly, we permitted the parties to introduce evidence concerning the officers' entry into the house and the related investigation, to show the sequence of events and the circumstances surrounding the detention.

his credit cards was outside the scope of that consent and all evidence and statements gained from that activity must be suppressed.

The government acknowledges that Defendant and Duarte were effectively "seized" for Fourth Amendment purposes once the officers discovered evidence of credit card fraud inside Duarte's house.  However, the government argues that the length of the detention was not unreasonable or unlawful given the circumstances here.  Even if the detention were deemed excessive, it did not taint the voluntariness of Defendant's consent to search the wallet.  Finally, the government contends that the search of the credit cards in his wallet did not exceed the scope of Defendant's consent.

### A.  *Length of Detention*

There is no question, and Defendant does not dispute, that the officers had reasonable suspicion to detain him while they investigated evidence of credit card fraud discovered in plain view inside Duarte's house.  Officers already had probable cause to detain Duarte, who admitted his residency in the house.  Although Defendant told the officers he just a guest there, officers encountered him in a room adjacent to the room where they found a large number of credit cards and other equipment that could be used to make counterfeit credit cards.  *See United States v. Gonzalez*, 70 F.3d 1236, 1238 (11th Cir. 1995) ("A person's proximity to a person whom officers have probable cause to believe is committing a crime may be considered as a factor in assessing reasonable suspicion.").

Defendant's complaint is with the length of the detention which he says was far longer than required to confirm or dispel any reasonable suspicion.  He was detained

for approximately three and a half hours before his wallet was searched. The testimony regarding the sequence of events varied slightly, but we know that Duarte signed the consent to search form at 11:12 a.m. *See* Def. Ex. B. Defendant signed the *Miranda* rights waiver form at 2:30 p.m., *see* Govt. Ex. 3, and produced his wallet for Det. Barazal approximately fifteen minutes later, at 2:45 p.m. Defendant claims that the duration of his detention grossly exceeded the maximum allowable for a warrantless detention that was not based no probable cause.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, an investigative detention based on reasonable suspicion is permissible. But "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). "There is a difference between an investigatory stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required." *United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004). The difference is "one of extent," requiring us to weigh "a limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Id.* at 1146 (citing *Dunaway v. New York*, 442 U.S. 200, 209 (1979)). Our task is to determine whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 1145 (citing *Sharpe*, 470 U.S. at 682).

The Supreme Court has explicitly shied away from establishing a "bright line" rule for evaluating whether an investigative detention is unreasonable; instead, the

Court emphasized that "common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685; *see also United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (citing *Sharpe*). Four non-exclusive factors to consider in this analysis are:  (1) the law enforcement purpose of the detention; (2) the diligence with which the police pursue the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention.  *Acosta*, 363 F.3d at 1146.

With regard to the first factor, the law enforcement purpose of the detention, there is no question that officers had every reason to investigate what appeared to be a substantial counterfeit credit card-making scheme.  The officers had probable cause to believe that Duarte, the owner of the residence, was involved in criminal activity. Defendant was the only other person in the house and he was in a room adjacent to where evidence of criminal activity could be observed in plain view.  Officers wanted to investigate the extent of the criminal activity, and they could not rule out Defendant's involvement in it (notwithstanding his and Duarte's protestations to the contrary) without further investigation.

However, when analyzing this factor, the Eleventh Circuit has explained that "the most important [consideration] 'is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.'" *Id.* at 1146 (citing *Hardy*, 855 F.2d at 759).  The question that follows is whether the officers utilized "brief, minimally intrusive investigation technique[s]"? *Id.*  We cannot say they did in this instance.  We think it was reasonable for the first officers on the scene, who lacked expertise in credit

card fraud, to call for assistance from one who had that expertise (Det. Barazal).  But it is not clear what investigatory purpose was served by Det. Barazal delaying matters further by then calling the Secret Service.  While awaiting Special Agent Kennerson's arrival, no one interviewed Defendant or Duarte.   Det. Barazal merely took photographs and maintained the scene.  Thus, from the time Special Agent Kennerson was contacted to the time he arrived and had reviewed the evidence with Det. Barazal, the investigation was effectively "on hold."  Meanwhile, Defendant continued to be detained.  Understandably, the Secret Service may have had reason to investigate a large-scale counterfeiting operation, but there is no evidence that bringing Special Agent Kennerson in contributed in any way to moving the investigation along so as to minimize the intrusion on Defendant.

The method of investigation the officers pursued here does not appear to have been intended to quickly confirm or dispel their suspicions regarding Defendant's involvement in the matter.  We are not saying that officers should have employed other means of investigating, only that what was done here was not brief or minimally intrusive. *Cf. Sharpe*, 470 U.S. 686 ("A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.").

By the same token, with regard to the second factor, we find that the officers did not diligently pursue their investigation "without necessary delay." *Acosta*, 363 F.3d at 1146.  Again, we think it understandable for the first officers to have sought assistance from Det. Barazal.  Thus, the delay of approximately thirty to sixty minutes

while waiting for him to arrive was reasonable. However, the next delay involving Special Agent Kennerson was not. Once Det. Balazar arrived, officers should have worked to bring their investigation to a swift conclusion. There is no evidence of a valid reason for not proceeding to interview Duarte and Defendant and, if appropriate, letting Defendant go. We see no indication that the officers acted in bad faith or intentionally attempted to delay the investigation, but the extreme length of the detention was not the result of anything Duarte or Defendant did. *See, e.g., Sharp*, 470 U.S. at 686-86 ( twenty minute detention delay was attributable almost exclusively to the evasive actions of the co-defendant who sought to elude police officers when they tried to effect an investigatory stop).

   As for the third factor, we find the scope and intrusiveness of the detention was reasonable under the circumstances. When officers arrived at Duarte's residence, Defendant was inside, allegedly awaiting a ride after loaning his car to Duarte's wife. Defendant and Duarte were asked to remain in the living room while the officers conducted their investigation. They watched a baseball game on television. They were not handcuffed or restrained in any way. We credit Det. Hernandez's testimony over Defendant's and accept that Defendant did not ask to leave. Defendant's ride never materialized during the time he was detained so he had no apparent way of leaving even if he had asked. Under these circumstances, we do not find the scope and intensity of the detention was significant. *See, e.g., Hardy*, 855 F.2d at 760 (holding that a fifty minute investigative detention was not unduly intrusive where the defendants spent the entire period of detention in their own car.); *United States v. Gil*,

204 F.3d 1347, 1350-51 (11th Cir. 2000) (seventy-five minute detention did not ripen into a full arrest where the defendant was placed, handcuffed, into the back of police car while officers searched her house because there was not a female officer present to search the defendant (a woman), and officers did not know if she was armed).

Finally, as discussed above, we find the duration of Defendant's detention was excessive under the circumstances.  The government has not provided nor have we found any court decision that condoned an investigatory detention of this length of time.  At the same time, there are numerous cases holding that detentions of significantly less duration than the one in this case were unreasonable.  *See, e.g., United States v. Place*, 462 U.S. 696, 709-10 (1983) (ninety minute seizure was deemed unreasonable; Supreme Court reiterated that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."); *United States v. Puglisi*, 723 F.2d 779, 790 (11th Cir. 1984) (one hundred forty minute seizure was deemed unreasonable); *cf. Gil*, 204 F.3d at 1350-51 (seventy-five minute detention was reasonable); *Hardy*, 855 F.2d at 761 (court found that the fifty minute detention was reasonable under the particular circumstances of the case but "confess[ed] to some unease on encountering a *Terry* stop lasting as long as fifty minutes.").

In conclusion, and weighing the above-stated factors, we find that Defendant's three and a half hour detention exceeded the duration of an allowable *Terry* stop.  We are *not* saying that there might not be some set of circumstances under which a three

and a half hour detention might not be reasonable, only that they are not present here. It is clear to us that the officers did not act expeditiously to confirm or dispel their suspicions about Defendant, as required by the Fourth Amendment.  Given the strict edict in *Terry* and its progeny, that any intrusion upon a person's liberty must be minimal unless supported by probable cause, we find that Defendant's prolonged detention here was unreasonable and matured into a *de facto* arrest without probable cause.

### B.    *Consent to Search Wallet*

However, our determination that Defendant's detention was unlawful does not end our inquiry.  Evidence that was obtained "by means sufficiently distinguishable" from illegal police action so as to be "purged of the primary taint" need not be suppressed.  *United v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).  Here, the government posits that the search of Defendant's wallet occurred only after Defendant gave his consent, an act that was voluntary and not tainted by the illegal detention.

It is the government's burden to demonstrate that Defendant's consent was in fact voluntary and that it was not a product of the illegal seizure.  *Id.* at 1308 (citing *United States v. Santa*, 236 F.3d 662, 676-77 (11th Cir. 2000)).  The focus is on causation: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Id.* In determining whether the consent was tainted by the illegal detention, we consider

three factors: "(1) the temporal proximity of the seizure and the consent; (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Id.* at 1309. These factors are not exhaustive, and the underlying question "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." *Id.* at 1309-10 (citation omitted). This is a fact-specific inquiry, with no single fact being dispositive. *Id.* at 1309.

With regard to the first factor, there is no bright-line rule defining the temporal factor, but generally, the shorter the time period between the illegal seizure and consent, the more likely exclusion. *Id.* at 1310 (citing *Santa*, where the defendant, handcuffed and lying on the floor, consented to a search just two to three minutes after police illegally entered his home, and *United States v. Chanthasouxat*, 342 F.3d 1271 (11th Cir. 2003), where only three minutes elapsed between the stop of the defendant's van and his consent to search). Conversely, the more time that has elapsed between the illegal act and the consent, the more likely the temporal factor weighs in favor of admissibility. *Id.* (citing *Devier v. Zant*, 3 F.3d 1445 (11th Cir. 1993), where the court held that the taint from a detention had been completely attenuated by the time the defendant confessed four days later).

In *Delancy*, even though the illegal protective sweep and the defendant's consent were "close in time," i.e., separated by no more than twenty minutes, the court focused on certain facts that distinguished the case from those in which close temporal proximity resulted in exclusion. *Id.* at 1310-11. The court noted, for example, that the defendant was not handcuffed or detained inside his house. The interaction between

officers and the defendant was conversational, and the defendant was not threatened. The court commented that the passage of time might have been more significant had the officers aimed their guns at the defendant, threatened her, or seized her. *Id.* at 1311.

In our case, Defendant gave his consent to search the wallet approximately three and a half hours after his initial detention. During this time period, he and Duarte were in Duarte's living room, watching television. Defendant did not ask to leave, and indeed, he had no apparent way to leave even if he had asked. Their demeanor was calm and cooperative, neither man was handcuffed, and the officers did not question them, threaten them, or display their weapons. The evidence shows a lack of a coercive environment which militates against a finding that the consent was the product of the illegal seizure.

The second factor is the presence of intervening circumstances or events that interrupt the causal connection between the illegal act and the possibly tainted consent. *Id.* There were significant intervening circumstances in our case beyond the mere passage of time. Following his initial detention, Defendant was advised of his *Miranda* rights, including his right to remain silent or to talk but then terminate the questioning at any time; his right to talk with an attorney; and the warning that anything he said could be used against him in subsequent court proceedings. *See* Govt. Ex. 3. Defendant was asked if he understood his rights, and he responded that he did. He then signed the waiver of rights form and proceeded to talk calmly and cooperatively with the officers. "*Miranda* warnings do not, without more, dissipate the taint of an illegal seizure," *Santa*, 236 F.3d at 678 (internal citation omitted).

However, Defendant's recognition of his Fifth Amendment rights (as opposed to Fourth Amendment rights) is another fact we may consider with regard to the issue of causation.  In addition to the *Miranda* warnings, we find it significant that Defendant was not asked about his wallet until the interview was over and the men were heading toward the front of the house.  At that point, Defendant was about to be released.  Any coercion resulting from the length of the detention had dissipated by the time Det. Barazal asked to check Defendant's wallet.

Finally, with regard to the third factor, we have already stated that we find no indication that the officers intentionally delayed the investigation or that they did so for the purpose of obtaining an involuntary consent.  Nor do we think they engaged in a subterfuge to illegally search Duarte's house or interrogate the men inside.  Officers obtained Duarte's written consent to search before entering the house.  Defendant was not questioned until Special Agent Kennerson arrived, at which point he was advised of his *Miranda* rights.  The request to search Defendant's wallet was made after the interview was concluded and on Defendant's way out.  The entire situation appears to have been handled calmly.  There is simply no evidence of any misconduct or intent to illegally exploit the situation.

Based on the foregoing analysis, we find that the government has met its burden of showing that Defendant's consent to a search of his wallet was voluntary, and that it was not the product of his illegal seizure.  The taint associated with the illegal detention was sufficiently purged by intervening circumstances.

### C.    *Scope of Consent*

Finally, Defendant argues that the scanning of his credit cards was outside the scope of his consent.  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  In assessing reasonableness, we must "consider what the parties knew to be the object of the search at the time the search occurred." *United States v. Zapata*, 180 F.3d 1237, 1243 (11th Cir. 1999) (citing *Jimeno*); *United States v. Street*, 472 F.3d 1298, 1308 (11th Cir. 2007) (same).

The scope of a search "is generally defined by the terms of its expressed object." *Jimeno*, 500 U.S. at 251; *see also United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990).  Thus, a general consent to search without any specific limitation or restriction on its scope will generally expand to the area or areas that are likely to contain evidence of the known object of the search.  *See, e.g., Jimeno*, 500 U.S. at 251 (finding it objectively reasonable for the police to conclude that the defendant's general consent to search his car, after the defendant had been advised that he was suspected of carrying narcotics in the car, included consent to search containers within the car that might contain drugs); *Street*, 472 F.3d at 1308-09 (general consent to search bedroom for evidence of bank robbery permitted officers to examine the defendant's police radio); *United States v. Hildago*, 7 F.3d 1566, 1570 (11th Cir. 1993) (general consent to search defendant's residence, curtilage, automobiles and outbuildings for any articles, items, letter or papers "to be used in the investigation of a drug violation" entitled officers to seize tax returns, personal checkbooks, and other financial

documents that could relate to drug violations); *United States v. Martinez*, 949 F.2d 1117, 1120 (11th Cir. 1992) (general consent to search defendant's storage unit for narcotics entitled officers to forcibly open the locked trunk of a car located inside the storage unit where narcotics might have been hidden); *cf. Strickland*, 902 F.2d at 941-42 (permission to search automobile for contraband could not reasonably be construed as permission to slash spare tire).

In our case, Defendant knew the officers were investigating counterfeit credit cards. He was present throughout the duration of the investigation. He was asked about the credit card fraud, and he repeatedly denied any involvement in it. Thus, when he held out his wallet after Det. Barazal asked for it, it was reasonable to conclude that the scope of Defendant's consent extended to the credit cards inside the wallet. Furthermore, it was reasonable to conclude that this consent extended to the scanning of his credit cards in order to ascertain whether or not they were counterfeit. Defendant's suggestion to the contrary, that he allowed officers to *look* at or inventory the cards but not to *read* them, is nonsensical given his understanding of the nature of the investigation and the purpose of his detention, i.e., to ascertain his involvement in credit card counterfeiting. *See, e.g., United States v. Megahed*, No. 8:07-cr-342-T23-MAP, 2009 WL 722481, at *2 (M.D. Fla. March 18, 2009) (a reasonable person would have concluded that FBI agent's suggestion to the defendant that agents would look for bombs, bomb-making materials, and anything that could be used to manufacture or build a bomb meant that agents might look for such information about explosives or bomb-making on the family computer, which the defendant used for internet shopping).

The two cases cited by Defendant to support his claim that his consent did not extend to a "high-tech examination" of the contents of his wallet are readily distinguishable.  In *United States v. Royster*, 204 F. Supp. 760, 761-62 (N.D. Ohio 1961), four police officers investigating counterfeit money entered the defendant's home late at night, proceeded to his bedroom, and asked the defendant, who appeared to have been roused from sleep, for identification.  He took his wallet from his trousers and started to thumb through several cards in an open pocket of the wallet.  *Id.* at 762. He was extremely nervous, his hands shook, and he was unable to select any identification card.  *Id.*  When one of the officers offered assistance, the defendant handed him his wallet.  *Id.*  The officer made a cursory inspection of the identification cards, then unzipped a closed pocket of the wallet and pulled out three counterfeit bills. *Id.*

The court had no difficulty finding that the search of the closed pocket was made without the defendant's consent.  *Id.* at 765-66.  "[O]bviously [the officer's] interest in securing further identification of [the defendant] was subordinate to his interest in ascertaining whether the defendant had any counterfeit bills in his possession.  By no stretch of logic can it be said that [the defendant] consented to the search of the closed pocket of his wallet."  *Id.* at 765.  Thus, the defendant in *Royster* very clearly limited the scope of his consent, something that did not occur here.

The decision in *United States v. Hawkins*, 49 C.M.R. 57(1974), is similarly distinguishable.  An officer was investigating the theft of three silver dollars and asked if he could search the defendant's wall locker specifically for the coins.  *Id.* at 58.  The officer expressly advised the defendant that he would not look through the defendant's

personal papers.  *Id.*  The officer obtained written consent to search the locker.  *Id.*
Inside the locker was the defendant's wallet, from which the officer removed a packet
of paper, including a pawn ticket.  *Id.* at 58-59.  The officer memorized the number on
the ticket, and subsequent investigation revealed it corresponded to a pawned, and
stolen, stereo.  *Id.* at 59.

The court found the removal and reading of the pawn ticket exceeded the scope
of the consent given.  *Id.* at 60.  While a wallet could contain both coins and currency,
the defendant "had the right to consider his personal papers, which were in the wallet,
to be protected from the prying eyes of one who upon inspection could determine that
the stolen coins were not within the wallet."  *Id.*  Mere possession of the pawn ticket
alone did not establish a nexus between it and the criminal behavior relating to the
theft of the coins which was the object of the search.  *Id.*  The court concluded that the
officer's removal and reading of the pawn ticket exceeded the scope of consent, at which
point the search became exploratory and illegal.  *Id.*  This case, like *Royster*, is
dissimilar to ours.

The magnetic strip on the back of a credit card, unlike a hard drive or an
external electronic storage device, is designed simply to record the same information
that is embossed on the front of the card.  On a legitimate card the information will
match.  A credit card reader merely verifies the information that cannot be read by the
naked eye.  Using a credit card reader to verify that the information matches is
analogous to swiping a driver's license (featuring a magnetic strip with biographical
information encoded therein) through a police vehicle computer to run a background

check.  It is analogous to using an ultraviolet light to detect whether a treasury bill is authentic, an act that even Defendant does not contend constitutes a separate "search."

We are not persuaded by Defendant's argument that a credit card number is so inherently private that one has a reasonable expectation of privacy in it.  Neither side was able to locate any cases addressing this particular topic (nor was the Court). Indeed, it does not inherently follow that just because a reasonable person does not share the number on her credit card with everyone, that she therefore has a reasonable expectation of privacy in that number.

In *Katz v. United States*, 389 U.S. 347, 351 (1967), the Supreme Court reiterated that the Fourth Amendment protects people, not places or things.  "What a person knowingly exposes to the public, . . ., is not the subject of Fourth Amendment protection."  *Id*.  Furthermore, the Court "has consistently held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) (no expectation of privacy in numbers dialed on a telephone, even though calls were placed from inside the defendant's house); *United States v. Miller*, 425 U.S. 435, 442-43 (1976) (no expectation of privacy in financial information voluntarily conveyed to banks and exposed to their employees in the ordinary course of business).  This is so "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."  *Miller*, 425 U.S. at 443.  *Cf. United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) (noting that every federal court to address the issue has concluded that subscribers have no Fourth

Amendment expectation of privacy in information provided to an internet provider; collecting cases).

A credit card number is an "access device" provided by a third-party retailer which is designed to be conveyed to third-parties (retailers) for the purpose of purchasing goods and services. This process is accomplished by manually inputting the information on the front of the card or swiping the card through a machine that reads the magnetic strip on the back. Thus, the credit card holder voluntarily turns over his credit card number every time he uses the card. There is no recognized expectation of privacy in that number, even though the credit card holder expects the information will be used only for a limited purpose and will not be conveyed to others.[4] Defendant, in his post-interview statement, admitted he tried to use the counterfeit credit card. He thus knowingly disclosed the information on the magnetic strip of his credit card to a third party and cannot claim a reasonable expectation of privacy in it.

We recognize that there has been a concerted effort in recent years, on the part of Congress, private enterprise, and individuals, to maintain the confidentiality of credit card numbers. But we are not convinced that this is because the information is so personal but rather, in great part due to the recognized threat from the fraudulent use of a person's financial and other personal information, i.e., identity theft. It would indeed by ironic that the government's investigation of that harmful economic fraud

---

[4]     As the government points out, one indication of the lack of a recognized expectation of privacy in a credit card number is the fact that the government is able to obtain credit card numbers without a showing of probable cause under the Stored Communications Act, 18 U.S.C. § 2701, *et seq.* Under 18 U.S.C. § 2703(c)(2) of this Act, the government may obtain certain customer records, including credit card numbers, without prior notice to the account holders pursuant to an administrative subpoena.

would be stifled by an identity thief's invocation of privacy in the very same credit card numbers that he is not supposed to have.  The Court is not prepared to find that an expectation of privacy exists, for Fourth Amendment purposes, in magnetically embossed credit card numbers issued by third parties for commercial purposes.

We conclude that reading the information on the magnetic strip of the credit cards taken from Defendant's wallet does not implicate the Fourth Amendment where, as we have found, Defendant voluntarily consented to a unrestricted search of his wallet.  We find no basis to suppress the evidence seized from his wallet, or the statements he made when faced with this evidence.  We therefore recommend that Defendant's motion to suppress be denied.

## III.   CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge does hereby **RECOMMEND** that Defendant Yaniel Medina's Motion to Suppress [D.E. 33] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have **until Monday, October 26, 2009,** to serve and file written objections, if any, with the Honorable Donald L. Graham, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.  *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 24th day of

October, 2009.


      /s/ *Edwin G. Torres*

EDWIN G. TORRES
United States Magistrate Judge